**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DANIEL T. MULLEN,                     )<br>                                                          )<br>           Plaintiff,                           )<br>                                                          )      No. 12 C 3751<br>v.                                                     )<br>                                                          )      Magistrate Judge Michael T. Mason<br>CAROLYN W. COLVIN, Acting         )<br>Commissioner of Social Security,[1]  )<br>                                                          )<br>           Defendant.                      )    | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Daniel T. Mullen ("claimant" or "Mullen") brings this motion for summary judgment [28] under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying claimant's application for disability insurance benefits ("DIB"). The Commissioner asks the Court to uphold its previous decision [29-1]. For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's decision is affirmed.

**I.    BACKGROUND**

   **A.    Procedural History**

Claimant filed an application for DIB on September 12, 2008, alleging a disability onset date of December 15, 2005, due to Parkinson's disease, avascular necrosis

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Carolyn W. Colvin is automatically substituted as the Defendant in this suit. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

secondary to alcohol use and his status post bilateral total hip arthroplasty. (R. 105-11.) Mullen was insured through December 31, 2010.[2] (R. 11.) The Social Security Administration ("SSA") denied his initial application on January 14, 2009, and then upon reconsideration on April 15, 2009. (R. 46-54.) Claimant filed a timely written request for a hearing before and administrative law judge ("ALJ") on June 16, 2009. (R. 64-65.) Claimant was the only person to testify at the ALJ's hearing on August 17, 2010. (R. 22.)

On September 21, 2010, the ALJ issued a decision denying the claim for benefits. (R. 8-18.) Claimant filed a request to review the ALJ's decision, and the Appeals Council denied review on March 19, 2012, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) Claimant subsequently filed this appeal pursuant to 42 U.S.C. § 405(g). The parties consented to this Court's jurisdiction [6] pursuant to 28 U.S.C. § 636(c).

**B.     Medical Evidence**

**1.     Treatment Notes**

Mullen has a history of avascular necrosis of both hips secondary to alcohol use. (R. 184.) He underwent a right hip replacement in 2002 and recovered "beautifully." (R. 182.) In January 2006, he had a successful left hip replacement with no complications. (R. 184.) An April 2006 treatment note indicated that the "x-rays look good" and Mullen was "really doing nicely." (R. 181.) A February 20, 2007 treatment note again indicated

---

[2] Because Social Security disability benefits under Title II equal insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means the applicant was working in 20 of the last 40 quarters. For an applicant who is thirty-one years old or older, the "last date of insured status" is generally five years after his date of last work.

2

that he was "doing reasonably well" and that his "x-rays look just fine." (R. 180.) In fact, claimant was "actually walk[ing] quite well," but still had a little bit of weakness and tightness in his left hip. (*Id.*)

In August 2007, claimant made an appointment to address concerns about his left shoulder. (R. 221.) Claimant reported developing a sensation of "dead arm" over the past four years. (*Id.*) The treating doctor ordered an MRI of the left shoulder and referred him to Dr. Donn D. Dexter ("Dr. Dexter"), a neurologist. (R. 217.)

Claimant had an MRI of the brain in December 2007 because he was complaining of tremors and questioned whether he had Parkinson's disease. (R. 194.) The MRI showed an indeterminate, subtle signal abnormality in the left portion of the pons. (*Id.*) It also showed a benign 1cm left choroidal fissure cyst. (*Id.*) Other intracranial contents were negative. (*Id.*) A follow-up MRI in June 2008, showed that the pons abnormality had "nearly completely resolved," and that the benign cyst was stable. (R. 192.)

In June 2008, Dr. Dexter diagnosed claimant as likely suffering from Parkinson's disease. (R. 305.) At a follow-up appointment in August 2008, Dr. Dexter referred claimant to Dr. Daniel Sa ("Dr. Sa"), a movement disorder specialist, for a second opinion as to whether he was suffering from Parkinson's disease. (R. 304.)

Dr. Sa evaluated claimant in September 2008. (R. 198.) Dr. Sa reviewed the December 2007 and June 2008 MRIs of claimant's brain and agreed that the slight abnormality that appeared on the first MRI was virtually non-existent on the second MRI. (*Id.*) In his conversation with Dr. Sa, Mullen reported a four or five year history of stiffness, slowness, and clumsiness affecting his left arm and hand. (*Id.*) Those

3

symptoms initially worsened, but seemed to have stabilized over the past two years. (*Id.*) He also reported a stress induced left hand tremor, and rare shaking in his left leg that had been worsening over the past two years. (*Id.*)

Mullen was taking Levodopa, which helped the slow motion, but did not help the tremors. (R. 198.) Dr. Sa found that claimant was not suffering from an intellectual impairment, thought disorder, or lack of motivation, but did experience short periods of sadness or guilt. (R. 199.) His daily living activities were generally normal. (R. 199-200.) However, during his "off periods" Mullen's handwriting, handling of utensils, dressing, grooming, and walking were a bit slow. (R. 200.) The "off periods" lasted 26-50% of the day and were predictable and did not come on suddenly. (R. 201.) Claimant did not report the presence of dyskinesias. (*Id.*)

Mullen's physical examination was generally normal. (R. 202-03.) However, Dr. Sa noted slight tremors in claimant's left and right hands and a severely impaired ability to perform finger taps with his left hand. (R. 203.) His left leg agility was also mildly slow. (R. 204.)

Dr. Sa concluded that despite claimant's denials, he was depressed and should consider treatment. (R. 204.) As for Parkinsonian syndrome, Dr. Sa found Mullen's symptoms "quite peculiar." (*Id.*) A history of four or five years of symptoms followed by stabilization is highly unusual, although claimant's tremors did appear to have worsened over that period. (*Id.*) The scant examination findings were also "strange" considering the reported four year history of symptoms. (*Id.*) Further, the examination showed incongruities like the marked slowness in finger taps with completely normal hand movement. (*Id.*) Accordingly, Dr. Sa found it difficult to establish a definitive diagnosis,

4

but Mullen's symptoms could represent early Parkinson's disease. (*Id.*) The blood work Dr. Sa ordered showed an elevated TSH level. (R. 206.)

Claimant had a check-up in October 2008 with Dr. Benjamin J. Boardman ("Dr. Boardman"), who appears to be his primary physician, to check on the elevated TSH. (R. 212.) Mullen reported suffering from Parkinson's disease and being treated by Dr. Dexter. (*Id.*) Claimant requested a referral to a teaching hospital rather than continuing treatment with Dr. Sa at the Marshfield Clinic. (*Id.*) At the check-up, claimant's balance, gait, and coordination were intact and his reflexes were normal. (R. 214.) No tremors or rigidity were noted. (*Id.*)

Claimant returned to Dr. Sa in March 2009. (R. 286.) Dr. Sa's treatment notes indicate "probable Parkinson's disease," with symptoms that reportedly began in 2003 or 2004. (*Id.*) Mullen's Levodopa prescriptions seemed to help with slow motion, but not tremors. (*Id.*) Dr. Sa "spent the majority of this 55 minute appointment in counseling" and answering claimant's extensive questions about Parkinson's disease. (R. 288.) After the second visit, Dr. Sa still hesitated in making a definitive Parkinson's diagnosis based on unusual facts about claimant's history and some evidence of psychogenic overlay. (*Id.*) Dr. Sa scheduled a follow-up visit in six months. (*Id.*) In a March 10, 2009 letter, Dr. Sa indicated that claimant was his patient and that he was following him for Parkinson's disease. (R. 289.) At that time, Dr. Sa opined that the disease was mild and not interfering with Mullen's activities of daily living. (*Id.*)

Claimant saw Dr. Dexter for a follow-up visit in June 2009. (R. 302.) In his notes, Dr. Dexter indicated that Dr. Sa reportedly confirmed the Parkinson's diagnosis. (*Id.*) Claimant did not take his medication prior to the visit and exhibited severe facial

5

masking and an intermittent, mild tremor over the upper and lower left extremities. (*Id.*)

Claimant saw Dr. Dexter for a six month follow-up visit in December 2009 and reported that his Parkinson's disease was worsening. (R. 300.) He reported having more symptoms on his left side and noticing symptoms on his right side. (*Id.*) Dr. Dexter found that the disease was progressing and prescribed Azilect. (*Id.*) He also referred claimant to a Parkinson's disease subspecialist, Dr. James Bower ("Dr. Bower").

Claimant saw Dr. Bower in March 2010. (R. 297.) According to Dr. Bower's notes, Mullen first saw Dr. Dexter in December 2007. (*Id.*) At that time, Dr. Dexter diagnosed him with Parkinson's disease and prescribed Sinemet. (*Id.*)

Claimant purposely did not take his Levodopa prior to the examination with Dr. Bower. (R. 298.) During the exam, Dr. Bower found that Mullen had moderate hypomimia and mild hypophonia. (*Id.*) He had left and right leg tremors and a left arm tremor at rest. (*Id.*) Dr. Bower found that claimant had young-onset Parkinson's disease and that he was beginning to experience the typical complications from the disease. (*Id.*) However, claimant did not appear to have dyskinesias and had a very good response to Levodopa. (*Id.*) Dr. Bower suggested a slight modification to claimant's medicine, which included an increase in the Mirapex dosage and an additional Sinemet tablet at bedtime. (*Id.*) He also noted that Mullen did not appear to need deep brain stimulation at that time. (R. 299.)

Claimant saw Dr. Dexter in July 2010 for a follow-up to his December 2009 visit. (R. 295.) Mullen reported that Dr. Bower had adjusted his medication to two Sinemet tablets four times per day, Mirapex three times per day, and one Azilect tablet per day.

(*Id.*) Claimant also stated that his Parkinson's was progressing and that he was experiencing more problems with dyskinesias and bradykinesia. (*Id.*) Dr. Dexter noted that Mullen's Parkinson's disease was moderately advanced and that he should continue his medication and return for a follow-up visit in six months. (*Id.*)

### 2. Agency Consultants

On January 8, 2009, Dr. Syd Foster ("Dr. Foster") completed a physical RFC assessment for claimant. (R. 258-65.) He did not examine or treat Mullen. (R. 258). Dr. Foster opined that claimant could lift and/or carry 20 pounds occasionally, and 10 pounds frequently, and could stand and/or walk and sit 6 hours out of an 8 hour workday. (R. 259.) He also found that claimant did not have any postural, manipulative, visual, or communicative limitations, or limits on pushing or pulling. (R. 259-62.) However, he found that claimant should avoid even moderate exposure to hazards due to his Parkinson's disease and the possible progression of the disease. (R. 262.)

Dr. Foster noted that medial source statements regarding claimant's physical capacities were not in the file. (R. 264.) In support of his conclusions, he noted that medication seemed to adequately control the Parkinson's symptoms and that claimant's balance and gait were "ok" during examinations. (R. 265.)

Dr. Kyla King ("Dr. King") completed a psychiatric review technique for claimant on January 12, 2009. (R. 266-279.) She found that Mullen was suffering from an affective disorder, but that it was not severe. (R. 266.) Specifically, she found that Mullen was suffering from mild depression that resulted in mild restrictions on daily living activities, mild difficulties in maintaining social functioning, mild difficulties in

7

maintaining concentration, persistence or pace, and no extended episodes of decompensation. (R. 276.)

### 3. Claimant's Functional Reports

Claimant submitted three functional reports dated November 24, 2008, June 10, 2009, and July 28, 2010. (R. 127-36, 318-21.) In the reports, claimant discussed his daily activities and noted that "everything takes longer to accomplish." (R. 129.)

### C. Claimant's Testimony

Mullen appeared at the August 17, 2010 hearing and testified as follows. At the time of the hearing, Mullen was forty-three years old. (R. 25.) He attended college for three years, but did not receive a bachelor's degree. (*Id.*) He was single with no children and lived by himself. (*Id.*) He was not working, but received quarterly payments as a tribal member of the Ho-Chunk Nation. (R. 26.) Mullen last worked a 40-hour week in 2005 doing sales and marketing for a family business. (R. 27.) Mullen quit that job because of an upcoming hip surgery and decided not to return to work after the surgery when the company was not doing very well. (*Id.*)

Mullen testified that he was not currently working because of symptoms related to Parkinson's disease. (R. 29.) He said that he had "the four main symptoms of Parkinson's." (R. 30.) The worst symptom was probably the bradykinesia or the extreme stiffness. (*Id.*) Mullen testified that despite his education, he did not think he could be productive at any job. (R. 31.)

Mullen takes Parkinson's medications that include Mirapex three times a day, Sinemet four times a day, and Azilect once a day. (R. 38.) Once the medication "kicks in," he takes care of his grooming needs. (R. 31.) He also tries to get out of the house

once a day for fresh air.  (*Id.*)  He reads and watches sports on the television.  (*Id.*)  He grocery shops and friends come to visit occasionally.  (R. 32.)

Mullen explained that he experiences bradykinesia, or slow motion movement.  (R. 33.)  He described it as a stiffness.  (*Id.*)  He also suffers from muscle rigidity and tremors, more on his left side than his right.  (*Id.*)  He stated that these symptoms result in a sustained disturbance of gross and dexterous movement.  (R. 34.)  He has a hard time walking, but does not use a cane or other aid.  (*Id.*)  Mullen has been experiencing these symptoms for four years, but they have become progressively worse.  (*Id.*)

The Parkinson's medications give him windows of time where they take away approximately 75 percent of his symptoms.  (R. 35.)  Those windows occur four times a day and last between two and two and a half hours.  (*Id.*)  Mullen takes his medications every four hours and it takes between 30 and 75 minutes for them to take effect.  (*Id.*)  During the hearing, Mullen's left arm or hand had slight tremors.  (R. 37-38.)  Claimant was not currently a candidate for deep brain stimulation, but he may have to consider that in the future.  (R. 38.)  Mullen also testified that he lacked the hand dexterity to use a keyboard accurately or for any length of time.  (R. 40.)

## II. LEGAL ANALYSIS

### A. Standard of Review

The Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)). In making this substantial evidence determination, the Court must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). The Court will "conduct a critical review of the evidence" and will not affirm the Commissioner's decision "if it lacks evidentiary support or an adequate discussion of the issues." (*Id.*)

While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.     Analysis Under the Social Security Act

In order to qualify for DIB, a claimant must be "disabled" under the Act. A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment…which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must make the following five-step inquiry: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively

disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 404.1520(a); *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing disability at steps one through four, after which the burden shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. *Zurawski v. Halter*, 243 F.3d 881, 886 (7th Cir. 2001).

The ALJ followed this five-step process. At step one, the ALJ found that Mullen had not engaged in substantial gainful activity after December 15, 2005, the alleged onset date. (R. 13.) At step two, the ALJ concluded that he had the severe impairments of Parkinson's disease and avascular necrosis secondary to alcohol use, status post bilateral total hip arthroplasty. (R. 13-14.) The ALJ further found that Mullen's mental impairment from depression was not severe because it did not cause more than a minimal limitation in his ability to perform basic mental work activities. (*Id.*)

At step three, the ALJ concluded that, even in combination, claimant's physical and mental impairments did not meet or medically equal the criteria of any listing in the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 14.) The ALJ explained that Mullen did not meet Medical Listing 11.06 for Parkinsonian syndrome because the record did not contain signs of significant rigidity, bradykinesia, or tremor in two extremities, which, singly or in combination, resulted in substantial disturbance of gross and dexterous movements, or gait and station. (*Id.*) Claimant's hip problems also did not meet Medical Listing 1.02. (*Id.*)

At step four, the ALJ determined that Mullen had the RFC to perform light work

as defined in 20 C.F.R. 404.1567(b) except with avoidance of moderate exposure to hazards such as dangerous machinery and heights and that he could perform his past relevant work as an accountant. (R. 14-17.) The ALJ noted that in making that finding, he considered all symptoms, objective medical evidence, opinion evidence, and claimant's testimony to the extent it was consistent with objective medical evidence. (R. 14-15.) The ALJ further explained that although Parkinson's symptoms restricted claimant in his daily activities, the medical evidence demonstrated that medications were controlling the symptoms at an acceptable level for the claimant to perform at his assigned RFC. (R. 17.) Because the ALJ found claimant capable of performing his past relevant work as an accountant, he did not make a step five finding and concluded that claimant was not disabled under the Act. (*Id.*)

Claimant's father represented him at the ALJ's hearing and in this appeal. Attorney Mullen does not appear to specialize in handling social security cases because a number of the issues raised in his briefs misstate or misconstrue the law applicable to this appeal. The briefs also include numerous factual errors. The record before this Court confirms that claimant did not meet his burden of establishing a disability at steps three and four of the disability determination process. Nevertheless, claimant's briefs suggest that he believes he is entitled to a finding of disability merely because he has been diagnosed with Parkinson's disease and testified that he meets the requirements of Listing 11.06. Unfortunately for claimant, a diagnosis and related symptoms do not automatically entitle someone to a finding of disability and an award of benefits. *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007). There must also be some medical evidence that the symptoms from the diagnosed impairment are not controlled by

12

proper medication and treatment, thus rendering him unable to work. The record before this Court contains no such conclusive medical evidence.

The Court will address each of claimant's three broad objections to the ALJ's decision below. Claimant argues that (1) he meets the requirements of Listing 11.06; (2) the ALJ's decision should be reversed; and (3) he is unable to work. By the Court's count, within these broad categories, claimant raises at least ten "sub-issues" that were either factually or legally incorrect. However, claimant does not object to the ALJ's finding that his mental impairment of depression was not severe. Thus, our analysis is limited to his severe physical impairments.

### C. Substantial Evidence Supports the ALJ's Determination that Claimant did not Meet the Requirements of Listing 11.06 and that he has the RFC to Perform Light work.

Claimant's attacks on the ALJ's decision are a bit muddled, so we will address his arguments that the ALJ erred in finding that he did not meet the requirements of Listing 11.06 for Parkinsonian Syndrome in the step three analysis and his argument that the RFC determination was wrong together. Both arguments misstate applicable facts and law and are ultimately unpersuasive. Further, the ALJ's findings that claimant did not meet the requirements of Listing 11.06 and that he had the RFC to perform light work that did not include moderate exposure to hazards such as dangerous machinery and heights are supported by substantial evidence.

A claimant bears the burden of demonstrating that his impairment meets or equals a listing, which requires satisfying all of the criteria of the listing impairment. *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999). In order to meet Listing 11.06, Mullen must have signs of significant rigidity, bradykinesia, or tremor in two extremities,

which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station. See 20 C.F.R. Part 404, Subpart P, Appendix 1. Claimant's support for this argument is limited to functional reports he completed, his hearing testimony, and treatment notes.

In support of the ALJ's finding that claimant did not meet the requirements of Listing 11.06, he cited to Dr. Foster's January 2009 RFC, the only RFC assessment in the record. Dr. Foster determined that claimant was capable of light work that did not include moderate exposure to hazards, and the ALJ properly adopted that finding. The ALJ also considered Dr. Sa's March 10, 2009 letter, which stated that claimant's Parkinson's disease was "mild and not interfering with his activities of daily living." (R. 289.) Dr. Sa was the only examining physician to opine as to claimant's functional abilities and, contrary to claimant's argument, the ALJ was required to consider that opinion. 20 C.F.R. § 404.1527(d). The RFC assessment and Dr. Sa's opinion, combined with the ALJ's review of the medical evidence in the record are sufficient to support the ALJ's RFC finding and his finding that Mullen did not meet the requirements of Listing 11.06.

Claimant incorrectly states that Dr. Sa only examined him once on September 9, 2008. In fact, claimant returned to Dr. Sa on March 4, 2009 for a 55-minute follow-up visit. That visit was only six days before Dr. Sa opined that claimant's Parkinson's disease was "mild and not interfering with his activities of daily living." Accordingly, the ALJ did not error in citing to Dr. Sa's opinion in support of his finding that claimant did not meet the requirements of Listing 11.06. See Simila v. Astrue, 573 F.3d 503, 514 (7th Cir. 2009).

14

The ALJ also considered treatment notes from Dr. Bower and Dr. Dexter. Mullen argues that Dr. Dexter's diagnosis of moderately advanced Parkinson's disease is evidence that he meets Listing 11.06. However, as stated above, the existence of a diagnosis and related symptoms does not require a finding that claimant meets Listing 11.06. *Skinner*, 478 F.3d at 845. Further, claimant incorrectly referred to Dr. Dexter's treatment notes as "medical opinions" as to his functional abilities. "Medical opinion" is a term of art defined in 20 C.F.R. § 404.1527, and treatment notes do not fit within that definition. The ALJ cannot attach controlling weight to treatment notes. *Kittelson v. Astrue*, 362 Fed. App'x 553, 558 (7th Cir. 2010). Because Drs. Dexter and Bower did not provide opinions as to claimant's physical limitations and residual capabilities, their treatment notes were of minimal help to the ALJ for purposes of making a disability determination. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

The ALJ's observation of tremors in claimant's left arm and hand also did not require a finding that he meets Listing 11.06 because, among other things, the tremors were only in one extremity and there was no medical finding that the tremors resulted in sustained disturbance of gross and dexterous movements, or gait and station. Contrary to claimant's argument, the ALJ also did not state that he would qualify under Listing 11.06. (R. 33, 41.) Finally, the ALJ's finding related to Listing 11.06 was not boilerplate and included an extensive analysis of the objective medical evidence. *See Rice v. Barnhart*, 384 F.3d 363, 370 n5 (2004).

A claimant's RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In assessing the RFC, the ALJ must consider all of the relevant evidence in the case record, including information about symptoms that might

15

not be shown by objective medical evidence alone. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5. A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* at 592.

Claimant's attacks on the RFC all lack merit. Claimant argues that the RFC did not reflect his current health status, did not indicate its source, and was incomplete and contradictory. Dr. Foster's RFC assessment, to which the ALJ afforded great weight, was complete and indicated its source. (R. 258-65.) Further, in arguing that the RFC is contradictory, claimant confused the ALJ's analysis of his physical and mental functional capacities. A correct reading of the ALJ's analysis confirms that there are no contradictions in his RFC findings. Finally, the ALJ's inaccurate description of the cause of alleged memory and concentration issues in one of Mullen's functional reports does not render the ALJ's RFC determination erroneous. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

Claimant also attacks the ALJ's finding that he could perform his past relevant work as an accountant, but does not provide any evidentiary support for this argument. Mullen's argument regarding his work in sales and marketing is misplaced because the ALJ did not find that he could perform that type of past relevant work. Similarly, his argument that the ALJ should only have considered his past work in sales and

16

marketing and not his work as an accountant in the step 4 analysis is wrong. Mullen's work as an accountant qualified as past relevant work because it was performed within the past 15 years. *See* 20 C.F.R. § 404.1560(b)(1). Finally, claimant argues that the ALJ failed to make a step 5 determination. Because the ALJ found him capable of performing his past relevant work as an accountant, the ALJ was not required to make a step 5 determination.

### D. Substantial Evidence Supports the ALJ's Credibility Finding

The ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (*citing Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). In other words, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008); *see also* SSR 96-7p, 1996 WL 374186, at *2 (The ALJ's decision must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Once the ALJ determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects" of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2. When statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record. *Id.* In making a credibility determination, the ALJ should consider

17

the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment, other than medication, that the individual has received; (6) any other measures the individual uses to relieve symptoms; (7) and any other factors concerning the individual's functional limitations. *Id.* at *3.

The ALJ's credibility determination in this case was not patently wrong and addressed many of the SSR 96-7p factors. In finding Mullen's statements regarding his symptoms not credible, the ALJ noted contradictions in his explanation for why he stopped working in 2005. The ALJ also noted claimant's vague answers to questions from his doctors and cited to medical record notes about inconsistencies in his reported symptoms and the objective medical findings. Similar to *Simila v. Astrue*, the ALJ found that claimant was overstating his symptoms and not credible. 573 F.3d 503, 518 (7th Cir. 2009). Further, the ALJ properly considered Mullen's daily activities as part of his SSR 96-7p analysis.

### E. Claimant's Remaining Arguments

Finally, the Court briefly addresses Mullen's remaining arguments. His claim that the ALJ was biased is unfounded. The court "begin[s] with the presumption that ALJs are impartial, and to overcome that presumption, a claimant must show that the ALJ 'displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.'" *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009) (*quoting Liteky v. United States*, 510 U.S. 540, 556 (1994)). While the ALJ's statements about a government handout were ill-advised and inartful, they are not evidence of antagonism

18

that rendered fair judgment impossible.

Mullen also argued that the ALJ erred by failing to recognize that Parkinson's disease is a deteriorating condition. In support of this argument, claimant criticizes the ALJ for citing to medical records from 2005-2007 because those records predate his Parkinson's diagnosis. Claimant appears to argue that the ALJ should have most heavily relied on the medical notes from his July 2010 doctor's appointment, the last appointment prior to the August 2010 hearing. Although in his briefs Mullen seems to concede that he was not disabled prior to his Parkinson's diagnosis in 2008, his alleged disability onset date is December 2005. Therefore, the ALJ was required to analyze his medical records beginning in 2005 through 2010 and was not required to give more weight to the July 2010 treatment notes.

Finally, Mullen's argument that the ALJ applied a heightened legal standard because he was under the age of 50 is also misplaced. During the hearing, the ALJ accurately stated that it was easier to be considered disabled under social security regulations if an individual is over age 50. *See* 20 C.F.R. § 404.4563. However, such age considerations only apply to step 5 evaluations. Because the ALJ found claimant capable of performing his past relevant work as an accountant, his analysis ended at step 4 and age was not a factor in the ALJ's disability determination.

### III. CONCLUSION

For the foregoing reasons, claimant's motion for summary judgment [28] is denied and the ALJ's decision is affirmed. It is so ordered.

**ENTERED:**

*Michael T. Mason*
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: August 8, 2013**